PREGERSON, Circuit Judge,
concurring in part and dissenting in part, with whom Judge W. FLETCHER joins:
I agree with the majority’s holding in all aspects, except parts 4-6. Specifically, I agree that we have jurisdiction to decide Trinidad y Garcia’s habeas corpus petition. Per curiam at 955-57. I disagree with the majority opinion, however, regarding the scope of our review.
The majority believes that under the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), 8 U.S.C. § 1231[1] (congressional legislation implementing our obligations under Article 3 of the Convention Against Torture (CAT)), “[a]n ex-traditee ... possesses a narrow liberty interest: that the Secretary comply with her statutory and regulatory obligations.” Per curiam at 957. I believe, however, that Trinidad y Garcia’s liberty interest is not merely about process. FARRA § 2242(a) unequivocally states that it is “the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture[.]” 8 U.S.C. § 1231. Because Trinidad y Garcia has made a non-frivolous claim that “there are substantial grounds for believing [he] would be in danger of being subjected to torture” if he is extradited to the Philippines, in violation of FARRA § 2242(a) and CAT, and thus in violation of the “laws or treaties of the United States,” 28 U.S.C. § 2241(c)(3), he has stated a cognizable habeas corpus claim in which he is entitled to meaningful review.
Thus, I disagree with the majority that Trinidad y Garcia’s liberty interest will be fully vindicated if the Secretary of State augments the record with a declaration “signed by the Secretary or a senior official properly designated by the Secretary” attesting that the Secretary has complied with her regulatory obligations. Per curiam at 957. Supreme Court precedent *1003 counsels otherwise: where we have found habeas jurisdiction, our review consists of “some authority to assess the sufficiency of the Government’s evidence))]” Boumediene v. Bush, 553 U.S. 723, 786, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). Because such a bare bones declaration from “the Secretary or a senior official properly designated by the Secretary,” per curiam at 957, does not allow us to “assess the sufficiency of the Government’s evidence,” Boumediene, 553 U.S. at 786, 128 S.Ct. 2229, I cannot join the majority opinion and therefore dissent.
The stakes in this case could not be higher:
[T]he right to be free from official torture is fundamental and universal, a right deserving of the highest stature under international law, a norm of jus cogens. The crack of the whip, the clamp of the thumb screw, the crush of the iron maiden, and, in these more efficient modern times, the shock of the electric cattle prod are forms of torture that the international order will not tolerate. To subject a person to such horrors is to commit one of the most egregious violations ’ of the personal security and dignity of a human being.
Hilao v. Estate of Marcos, 25 F.3d 1467, 1475 (9th Cir.1994) (quoting Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 717 (9th Cir.1992)). This international norm prohibiting torture has been adopted by 149 countries[2] that are parties to the CAT.[3] Article 3 of CAT requires that a State Party riot return a person to another State where there are “substantial grounds for believing that he would be in danger of being subjected to torture.” The United States signed CAT, and the Senate ratified the treaty with certain provisions, including that “the terms of CAT were not affected, except that the ‘substantial grounds for believing’ basis was clarified to mean ‘if it is more likely than not that he would be tortured.’ ” Edu v. Holder, 624 F.3d 1137, 1144 (9th Cir.2010) (citing 136 Cong. Rec. S17486, S17492 (1990)). Congress implemented our CAT obligations in the FAR-RA stating clearly that it is “the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture,” FARRA § 2242(a).
Trinidad y Garcia alleged that his extradition to the Philippines violates FARRA and CAT, and presented compelling evidence that “there are substantial grounds for believing [he] would be in danger of being subjected to torture” if the United States transferred him to the Philippines. FARRA § 2242(a). Specifically, Trinidad y Garcia presented credible evidence in the form of affidavits and court documents from the Philippines revealing that the Philippine government tortured almost all of his co-accused, and numerous authoritative country reports detailing how Philippine law enforcement officials continue to torture and abuse suspects.
The Philippines sought Trinidad y Garcia’s extradition to stand trial on a charge of kidnaping for ransom. Five of Trinidad y Garcia’s co-accused were tortured by the Philippine government. The treatment of two of these co-accused, Gerilla and Villaver, is especially troubling. According to Gerilla’s sworn affidavit, police officers abducted him from his home, blindfolded him, secluded him in a small, cold room, *1004 and denied him food and water. When Gerilla denied the Philippine officials’ charges against him, the police officers placed a plastic bag over Gerilla’s head, causing him to suffocate; the officers removed the bag at the last minute. The Philippine police officers poured soft drinks down Gerilla’s nose, making it hard for him to breathe, and then forced him to eat a foul-tasting substance, causing him to vomit. As Gerilla continued to maintain his innocence, the officers affixed electric wires to Gerilla’s inner thighs, shocking him with electricity, and then forced him to endure extreme temperatures by shoving ice down his shirt. Eventually Gerilla confessed to the charges against him after the officers threatened to abduct and rape his sisters. A Philippine trial judge found this account of torture credible, deemed Gerilla’s extrajudicial confession invalid and inadmissible, and dismissed all the charges against him.
Trinidad y Garcia also presented an affidavit from another co-accused, Villaver, who similarly endured physical torture, including suffocation and electric shocks. When Villaver refused to confess to any crime, Philippine officers took him to a remote rice paddy, removed his restraints, and told him, “Do something to save your life, it is all up to you.” When Villaver attempted to run, the officers shot him twice in the back and another bullet grazed his chin. Instead of taking Villaver to a hospital, the officers put him into their jeep and began suffocating him by holding a piece of plastic with cloth over Villaver’s nose. While suffocating, Villaver lost bodily control, causing him to defecate. Eventually, the officer released the pressure on Villaver’s nose and mouth. The officers took Villaver to a hospital where doctors performed emergency surgery. Villaver survived.
In addition to these specific and credible accounts of torture Trinidad y Garcia’s co-accused suffered at the hands of Philippine officials, Trinidad y Garcia presented numerous supporting documents demonstrating the pervasiveness of torture in the Philippines. The State Department’s 2007 country report for the Philippines — a report prepared by the Secretary’s own agency — states, “members of the security forces and police were alleged to have routinely abused and sometimes tortured suspects and detainees.” According to Amnesty International’s 2003 country report for the Philippines, “torture persists.” “Techniques of torture documented by Amnesty International include electroshocks and the use of plastic bags to suffocate detainees.” The report finds that “a continuing de facto climate of impunity that shields the perpetrators of torture and other grave human rights violations” exists in the Philippines.
Trinidad y Garcia presented his CAT claim to the Secretary of State. But despite this evidence, Secretary of State Condoleeza Rice authorized a warrant to surrender Trinidad y Garcia for extradition on September 12, 2008. Trinidad immediately filed a request to stay the extradition pending the resolution of a habeas corpus petition, which the district court granted. On November 24, 2009, Trinidad filed a writ of habeas corpus under 28 U.S.C. § 2241, alleging that he was being unlawfully detained pending extradition under the Secretary of State’s surrender warrant because he was denied procedural due process, and because his extradition will violate CAT and federal law, and deny him his substantive due process rights. The Secretary of State refused to provide the district court with any evidence for it to review the Secretary’s decision to surrender Trinidad y Garcia for extradition. Because of Trinidad y Garcia’s compelling unrebutted evidence of the likelihood of torture, the district court granted Trinidad y Garcia’s habeas petition.
*1005 In reviewing Trinidad’s habeas claim and the compelling evidence he submitted, the majority believes all that is required of the State Department is a declaration from the Secretary “or a senior official properly designated by the Secretary” attesting that the Secretary considered Trinidad y Garcia’s torture claim and found it not “more likely than not” that he would face torture if returned to the Philippines. Per curiam at 956-57. But such a superficial inquiry in the context of a habeas corpus petition abdicates the critical constitutional “duty and authority” of the judiciary to protect the liberty rights of the detained by “call[ing] the jailer to account.” Boumediene, 553 U.S. at 745, 128 S.Ct. 2229.
In Boumediene, a case involving a habeas challenge by prisoners held as “enemy combatants” at the Guantanamo Bay detention camp, the Supreme Court explained that “[wjhere a person is detained by executive order, rather than say, after being tried and convicted in a court, the need for collateral review is most pressing.” 553 U.S. at 783, 128 S.Ct. 2229. The Court explained that while habeas proceedings challenging detention by executive order do not need to contain the same procedures as a criminal trial, “the writ must [nevertheless] be effective.” Id. The Court explicitly noted that “[i]t is uncontroversial ... that the habeas privilege entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to ‘the erroneous application or interpretation’ of relevant law.” Id. at 728-29, 128 S.Ct. 2229 (emphasis added) (citing INS v. St. Cyr, 533 U.S. 289, 302, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001)). Accordingly, the Court was clear that “[f]or the writ of habeas corpus, or its substitute, to function as an effective and proper remedy in this context, the court that conducts the habeas proceeding must have the means to correct errors that occurred during the[earlier proceedings.]” Id. at 786, 128 S.Ct. 2229. “This includes some authority to assess the sufficiency of the Government’s evidence against the detainee.” Id. (emphasis added).
But all we have here is a black box because the Secretary has refused to present to the district court any evidence she considered in deciding to surrender Trinidad y Garcia to the Philippines. The majority’s requirement that the Secretary or her designee only produce an affidavit declaring that the Secretary determined it is not “more likely than not” that Trinidad y Garcia will suffer torture if extradited to the Philippines does not allow the district court to conduct a meaningful habeas proceeding. See id. Such a document does not allow the district court “to assess the sufficiency of the Government’s evidence against the detainee,” nor does it provide the district court an opportunity to “correct errors that occurred during the [earlier proceedings],” as habeas corpus review requires. Id. (emphasis added).
I disagree with the majority that Munaf v. Geren,[4] 553 U.S. 674, 128 S.Ct. 2207, 171 *1006 L.Ed.2d 1 (2008), and the Rule of Non-Inquiry prevent us from performing our constitutional duty of “inquir[ing] into the substance of the Secretary’s decision.” Per curiam at 957.
The majority appears to cite Munaf for the proposition that an executive decision to surrender a detainee accused of committing crimes in another country should be addressed solely by the executive. But Munaf is readily distinguishable from the present case. The facts of Munaf are unique and the Supreme Court was clear that its holding was circumscribed to the circumstances of that case. See 553 U.S. at 700, 128 S.Ct. 2207 (“[I]n the present context [petitioner’s concerns of torture are] to be addressed by the political branches[.]” (emphasis added)); see also id. at 706, 128 S.Ct. 2207 (Souter, J., concurring) (stating that “[t]he Court holds that ‘under circumstances such as those presented here ... habeas corpus provides petitioners with no relief ” and explicitly outlining the unique circumstances of the case). In Munaf, petitioners were two U.S. citizens who were captured in Iraq and held by U.S. military forces in Iraq, at the request of the Iraqi government, pending prosecution in Iraqi courts for crimes they allegedly committed while in Iraq during ongoing hostilities. Id. at 681-85, 128 S.Ct. 2207. Such circumstances require the courts to “adjudicate] issues inevitably entangled in the conduct of our international relations[,]” and the Court therefore approached the issues “cognizant that courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.” Id. at 689, 128 S.Ct. 2207 (internal quotation marks omitted). Further, the petitioners in Munaf were not seeking simple release: if they were released in Iraq, they would likely be arrested by Iraqi forces, the very event they were seeking to avoid. Id. at 692, 128 S.Ct. 2207. Thus, the Munaf petitioners sought “transfer” to another country where they believed they would not suffer torture. Id. The Court noted that this requested relief did not present a proper habeas claim: “the ‘release’ petitioners seek is nothing less than an order commanding our forces to smuggle them out of Iraq.” Id. at 697, 128 S.Ct. 2207.
In contrast, Trinidad y Garcia is in the United States and seeks the proper form of habeas “release,” as opposed to the “transfer” petitioners sought in Munaf. Further, Trinidad y Garcia has made an individualized claim of torture based on official documents from Philippine courts and reports by the State Department — the very department that now refuses to account for its extradition decision — regarding the pervasiveness of torture in the Philippines. Such a claim hardly “intrude[s] upon the authority of the Executive in military and national security affairs.” Id. at 689, 128 S.Ct. 2207 (internal quotation marks omitted). Moreover, adjudication of FARRA torture claims cannot possibly involve “issues inevitably entangled in the conduct of our international relations[,]” because federal courts routinely adjudicate torture claims as part of our review of immigration proceedings. Id. (internal quotation marks omitted); See, e.g., Khouzam, v. Attorney Gen. of the United States, 549 F.3d 235, 253 (3d Cir.2008) (“In fact, we routinely evaluate the justice systems of other nations in adjudi *1007 eating petitions for review of removal orders”)-
Moreover, the Supreme Court explicitly stated in Munaf that it “expressed] no opinion” on whether habeas relief was available if a petitioner asserted a claim that his extradition would violate the Secretary’s obligations under FARRA. 553 U.S. at 703 & n. 6, 128 S.Ct. 2207. (“Neither petitioner asserted a FARR Act claim in his petition for habeas, and the Act was not raised in any of the certiorari filings before this Court____Under such circumstances we will not consider the question.”); see also id. at 706, 128 S.Ct. 2207 (Souter, J., concurring) (“I would add that nothing in today’s opinion should be read as foreclosing relief for a citizen[5] of the United States who resists transfer ... in which the probability of torture is well documented, even if the Executive fails to acknowledge it.”); see also Khouzam, 549 F.3d at 254 (finding that the principles of Munaf did not apply to a FARRA claim because the Supreme Court “expressly distinguished claims under CAT”). In contrast, Trinidad y Garcia’s habeas claim alleges that his extradition will violate his constitutional rights not to be transferred in violation of a federal law, FARRA, and the U.S.’s treaty obligations under CAT, and presented numerous documents that show there is a substantial likelihood he will be tortured if returned to the Philippines. Thus, because Trinidad y Garcia’s case is so readily distinguishable from the unique circumstances of Munaf and the Court in Munaf explicitly reserved for another day the decision of whether its holding would apply to a legitimate FARRA claim, I do not believe that Munaf limits our review to the extent the majority believes it does.
The Rule of Non-Inquiry similarly does not limit the scope of our review to such a superficial level as the majority suggests. The Rule of Non-Inquiry is a rule the courts imposed on themselves to preserve “Executive discretion.” Emami v. United States Dist. Court, 834 F.2d 1444, 1454 (9th Cir.1987); Prasoprat v. Benov, 421 F.3d 1009, 1016 (9th Cir.2005) (noting that “the rule of non-inquiry is based on ... the Secretary of State’s exercise of discretion”). But the Secretary’s obligation not to extradite someone who will “more likely than not” face torture is a nondiscretionary duty under FARRA, as State Department counsel conceded in briefing and at oral arguments. Accordingly, proper habeas review exists for Trinidad y Garcia to challenge whether he is being held because of “the erroneous application or interpretation of relevant law.” Boumediene, 553 U.S. at 729, 128 S.Ct. 2229 (internal quotation marks omitted).
Munaf and the Rule of Non-Inquiry therefore do not remove all substantive review of the Secretary’s decision to surrender an extraditee when he has presented a non-frivolous FARRA claim that it is “more likely than not” he will suffer torture when transferred to the requesting country. However, the underlying principles of Munaf and the Rule of Non-Inquiry at least suggest that we do not have the sweeping authority to overturn the Secretary’s decision simply because we disagree with it. Our review lies somewhere between these two extremes. A mere statement that the Secretary has complied with her duties is not enough under current *1008 precedent. In fact, the Supreme Court in Boumediene suggested as much when it rejected the government’s arguments that the Combatant Status Review Tribunal (CSRT) provided sufficient process to substitute for the writ of habeas corpus:
Although we make no judgment whether the CSRTs, as currently constituted, satisfy due process standards, we agree with petitioners that, even when all the parties involved in this process act with diligence and in good faith, there is considerable risk of error in the tribunal’s findings of fact. This is a risk inherent in any process that, in the words of the former Chief Judge of the Court of Appeals, is “closed and accusatorial.” And given that the consequence of error may be detention of persons for the duration of hostilities that may last a generation or more, this is a risk too significant to ignore.
553 U.S. at 785, 128 S.Ct. 2229 (internal citation omitted). In Trinidad y Garcia’s case, the decision by the Secretary of State to surrender him for extradition was entirely “closed” and the consequences of error here are significant: Trinidad y Garcia will suffer torture. For these reasons, I cannot accept as sufficient habeas process a letter from the Secretary that she properly followed State Department procedures in making her decision to extradite Trinidad y Garcia. See also In re Burt, 737 F.2d 1477, 1484 (7th Cir.1984) (“We hold that federal courts undertaking habeas corpus review of extraditions have the authority to consider not only procedural defects in the extradition procedures that are of constitutional dimension, but also the substantive conduct of the United States in undertaking its decision to extradite if such conduct violates constitutional rights.”).[6]
While the majority appears to believe that a substantive review of the Secretary’s determination on Trinidad y Garcia’s CAT claim violates our constitutional structure, I believe such review only strengthens our constitutional system of checks and balances, as well as the Great Writ of habeas corpus. The Supreme Court recognized as much in Boumediene:
[T]he exercise of [the Executive’s powers as Commander in Chief] is vindicated, not eroded when confirmed by the Judicial Branch. Within the Constitution’s separation-of-powers structure, few exercises of judicial power are as legitimate or as necessary as the responsibility to hear challenges to the authority of the Executive to imprison a person.
553 U.S. at 797, 128 S.Ct. 2229.
Finally, I fully acknowledge that there are serious and legitimate concerns in a case such as this regarding the protection of classified information. The district court has sufficient tools, such as in camera review and protective orders, to ensure that classified information is properly and effectively protected. See e.g., Khouzam, 549 F.3d at 259 n. 16 (suggesting a protective order regarding the disclosure of dip *1009 lomatic assurances would ameliorate the government’s “concern[] that public disclosure of certain information may jeopardize national security”). I do not feel the need, however, to circumscribe the district court at this point and believe that the district court will use its sound discretion to accommodate this important interest. See Boumediene, 553 U.S. at 796, 128 S.Ct. 2229(“We recognize, however, that the Government has a legitimate interest in protecting sources and methods of intelligence gathering; and we expect the District Court will use its discretion to accommodate this interest to the greatest extent possible.... These and other remaining questions are within the expertise and competence of the District Court to address in the first instance.”).
Thus, for the reasons discussed above, I dissent from the majority’s declaration that Trinidad y Garcia’s liberty interest will be fully vindicated if the Secretary of State augments the record with the bare bones declaration the majority suggests.

. Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-761, 2682-822-823 (1998) (codified as a note to 8 U.S.C. § 1231 (1991)).

. 1465 U.N.T.S. 85.

. United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, adopted by unanimous agreement of the U.N. General Assembly, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51 at 197, U.N. Doc. A/RES/39/708 (1984), entered into force as to the United States Nov. 20, 1994, signed Apr. 18, 1988.

. Munaf cannot be read to supersede the holding or underlying reasoning in Boumediene. Both cases were decided in the same year, 2008. Nor are the stakes arguably higher in Munaf than Boumediene, which involved significant national security matters. The Supreme Court noted in Boumediene that even in such high stakes circumstances, it is critical for the courts to properly adjudicate habeas claims:
In considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches____ Officials charged with daily operational responsibility for our security may consider a judicial discourse on the history of the Habeas Corpus Act of 1679 and like matters to be far removed from the Nation's present, urgent concerns____ Security depends upon a sophisticated intelli *1006 gence apparatus and the ability of our Armed Forces to act and to interdict. There are further considerations, however. Security subsists, too, in fidelity to freedom’s first principles. Chief among these are freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers. It is from these principles that the judicial authority to consider petitions for habeas corpus relief derives.
553 U.S. at 796-97, 128 S.Ct. 2229.

. That Trinidad y Garcia is not a citizen of the United States is irrelevant. FARRA does not distinguish between citizens and non-citizens, see FARRA § 2242(a), nor does such a distinction matter for a due process claim, see Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ("[T]he Due Process Clause applies to all ‘persons' within the United States, including aliens[.]“).

. Like the Supreme Court in Boumediene, I make no judgment here about what the appropriate level of review should be in such cases:
The extent of the showing required of the Government in these cases is a matter to be determined. We need not explore it further at this stage. We do hold that when the judicial power to issue habeas corpus properly is invoked the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner’s release.
553 U.S. at 787, 128 S.Ct. 2229. At a minimum, the "arbitrary and capricious" standard articulated in Cornejo-Barreto v. Seifert, 218 F.3d 1004 (9th Cir.2000), would be appropriate. Therefore, I would not overrule this court’s decision in Cornejo as the majority does. Per curiam at 957.